**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| ROBERT SCHILLING, *Plaintiff*, v. RICHARD WASHBURNE, *et al.*, *Defendants*. | CASE NO. 3:21-cv-00022 MEMORANDUM OPINION JUDGE NORMAN K. MOON |

Plaintiff Robert Schilling alleges that two poll workers and the Chief Elections Officer of the Woodbrook Precinct in Albermarle County attempted to prevent him from voting in the June 2021 Democratic primary because they knew him to be a Republican radio personality and outspoken critic of the Albermarle County Board of Supervisors. Dkt. 31 ("Amended Complaint") ¶ 42. Specifically, Schilling alleges that Defendants used the pretext of a non-existent mask mandate to temporarily block his access to the voting machines, *id*., thereby violating his constitutional and statutory voting rights and committing various intentional torts, *id*. at ¶ 1.

Defendant and Chief Elections Officer Leo Mallek has moved to dismiss Schilling's suit. Dkt. 6. Mallek argues that even should Schilling's allegations prove true, he will not have committed a federal rights violation or a tort. Dkt. 7 pp. 1–2. The Court disagrees. Because Schilling has stated claims under 42 U.S.C. § 1983 and state tort law, the motion to dismiss will be denied with respect to those counts. But it will be granted with respect to Schilling's putative Voting Rights Act claim because the provision Schilling invokes does not create a private cause of action.

**I**

The following facts are alleged in Schilling's amended complaint and assumed true for purposes of resolving this motion. *See King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016) (explaining standard of review).

Plaintiff Robert Schilling is a local conservative radio host and internet journalist. Amended Complaint ¶ 2. Prior to election day in Virginia's Democratic primary, Schilling wrote Richard Washburne, the General Registrar of Voters in Albemarle County, and received confirmation that he would not be required to wear a mask to vote. *Id*. at ¶ 23.

However, upon entering Woodbrook Precinct on election day, Schilling was stopped by Defendant Leo Mallek, the Woodbrook Precinct's Chief Officer of Election, *id*. at ¶ 3, and asked to put on a mask before proceeding*, id*. at ¶ 25. Schilling declined to do so. *Id*. at ¶ 26. At some point during their interaction, Mallek lowered his own mask. *Id*. at ¶ 27. Schilling asked for Mallek's name, but Mallek did not give it. *Id*.

Subsequently, Defendant David Carey, a poll worker, *id*. at ¶ 5, approached Schilling from behind and physically blocked his path to the polling area. *Id*. at ¶ 29. Carey attempted to convince Schilling to leave the building. *Id*. at ¶ 30. When Schilling tried to walk around Carey instead, Carey stepped in front of Schilling, causing their bodies to make contact. *Id*. at ¶ 30. Carey then grabbed Schilling's arm and/or shoulder. *Id*. Schilling exclaimed, "You cannot block me from voting! Take your hands off me!" *Id*. at ¶ 31. Once Carey's hands were removed, Schilling proceeded around Carey into the polling area. *Id*. Though the interaction with Carey took place in Mallek's presence, Mallek did not at any point express any objection to Carey's actions. *Id*. at ¶ 30.

Once inside the polling area Schilling was approached from behind by Defendant

Lawrence Bouterie, another poll worker. *Id*. at ¶¶ 6, 32. Bouterie put his hands on Schilling's arm and/or shoulder and demanded that Schilling follow him. *Id*. at ¶ 33. Schilling again stated, "Don't touch me!" *Id*. at ¶ 34. Bouterie responded, "We're going outside." *Id*. at ¶ 35. Schilling continued to refuse, stating "I'm not going outside. You can't tell me I can't vote." *Id*. Another poll worker placed a call to Washburne and loudly stated, "We have a problem! We have a voter who refuses to wear a mask!" *Id*. at ¶ 36.

Schilling was ultimately permitted to vote. *Id*. at ¶ 37. But he claims he was delayed five minutes by the events described above. *See id* at ¶¶ 37, 40 (Schilling estimates he could have voted within two minutes if not delayed, but because of his confrontation with Defendants a total of seven minutes elapsed from the time he entered the precinct to the time he cast his vote).

Schilling also alleges that his criticism of the Board of Supervisors in Albermarle County is well-known, *id*. at ¶ 2, that Mallek's wife is a member of that Board, *id*. at ¶ 3, and that Mallek is aware of Schilling's criticisms, *id*. at ¶ 42. Schilling further alleges that these facts, alongside Carey's and Bouterie's willingness to make close bodily contact, as well as Mallek's removal of his own mask, support an inference that the Defendants' purported concern with enforcing a mask mandate was pretext and that their true motivation was to prevent Schilling from voting in retaliation for his political activism. *Id*. at ¶¶ 41–42. *See also id*. at ¶ 8 (alleging that Mallek and his codefendants acted "in concert and with a common purpose").

**II**

"A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the claims pled in a complaint." *ACA Fin. Guar. Corp. v. City of Buena Vista, Va.*, 917 F.3d 206, 211 (4th Cir. 2019). A complaint is considered sufficient if it alleges facts that, taken as true, plausibly state a

claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Only facts can render a claim for relief plausible. "[F]ormulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Nor is it sufficient for a plaintiff to plead facts merely consistent with liability. The plaintiff must plead enough factual content to nudge a claim across the border from mere possibility to plausibility. *Id*. at 570. *See also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009).

**III**

As a threshold matter, the allegation that Mallek and his co-defendants acted with ulterior motives is itself an inference that should not be credited unless adequately supported by factual allegations. *See Iqbal*, 556 U.S. at 679 ("[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."). *See also Giacomelli*, 588 F.3d at 193 (instructing courts to discount "unadorned conclusory allegations"); *Jordan v. Alt. Res. Corp.*, 458 F.3d 332, 338 (4th Cir. 2006) (reiterating that a court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments.") (internal quotation marks omitted). However, at the motion to dismiss phase, a plaintiff need only allege sufficient facts to render a proffered inference plausible, as opposed to merely possible. *See Iqbal*, 566 U.S. at 678–89.

While this is a close case, the Court concludes that Schilling has pled sufficient facts to satisfy the liberal standards applicable to this motion and render plausible his allegation of subterfuge. In arriving at this determination, the Court relies on three factual allegations in particular: (1) that there was, in actuality, no applicable mask requirement; (2) that Schilling is a

well-known critic of Mallek's wife; and (3) that Mallek removed his own mask while purportedly attempting to enforce a masking requirement.

But that is not the end of the analysis. The question remains whether Mallek's alleged conduct—including the inference that he acted to impede Schilling from voting because of Schilling's political activism—constitutes a federal rights violation or a tort under Virginia law.

**Count One: Violation of Constitutional Right to Vote**

In his first count, Schilling asserts a claim under 42 U.S.C. § 1983. Amended Complaint ¶¶ 43–53. That familiar statute creates a private right of action against "[e]very person who, under color of [state law], subjects, or causes to be subjected [any person] to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws [of the United States]."

To state a claim under § 1983, "a plaintiff must establish three elements . . . : (1) the deprivation of a right secured by the Constitution or a federal statute; (2) by a person; (3) acting under color of state law." *Jenkins v. Medford*, 119 F.3d 1156, 1159–60 (4th Cir. 1997). Only the first requirement is at issue here.

Schilling claims that Mallek deprived him of his constitutional right to vote. Amended Complaint ¶ 46. Several constitutional amendments explicitly guarantee the right to vote against certain named forms of discrimination. *See* U.S. CONST. amend. XV, § 1 (forbidding abrogation or denial of right to vote on the basis of race, color, or previous condition of servitude); U.S. CONST. amend. XIX (forbidding abrogation or denial of right to vote on the basis of sex); U.S. CONST. amend. XXVI, § 1 (forbidding abrogation or denial of right to vote of those 18 and older

on the basis of age). Another prohibits poll taxes in federal elections. U.S. CONST. amend. XXIV, § 1.

In addition to these explicit protections, the Supreme Court has repeatedly declared the right to vote, including the right to vote in a state primary election, to be a fundamental right secured by the Equal Protection Clause of the Fourteenth Amendment. *See e.g.*, *Reynold v. Sims*, 377 U.S. 533, 555 (1964) (explaining that "[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government."). Thus, it is clearly established that '"severe' restrictions" on the right to vote are subject to strict scrutiny. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). *See also Harper v. Va. St. Bd. of Elections*, 383 U.S. 663, 667 (1966) (stating that "any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized") (quoting *Reynolds*, 377 U.S. at 562).

If Schilling's allegations are true, as we must assume they are, it is not open to doubt that Mallek infringed Schilling's constitutional right to vote. The attempt to remove Schilling was surely a "severe" burden on his right. *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 205 (2008) (Scalia, J., concurring) (contrasting "ordinary and widespread burdens, such as those requiring 'nominal effort' of everyone" with "severe" burdens that "go beyond the merely inconvenient") (internal quotation marks omitted). And it is equally clear that there is no compelling state interest in detaining a lawful voter because of his politics or his political expression. Schilling has stated a claim under § 1983 and the motion to dismiss will be denied with respect to Count One.

**<u>Count Two</u>: Violation of Voting Rights Act**

Schilling's second count attempts to state a claim under the Voting Rights Act. Amended Complaint ¶¶ 54–59. 52 U.S.C. § 10307(b) provides that "[n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote[.]"

Mallek argues that this language does not create a private right of action, *see* Dkt. 7, p. 3, and he is correct.

"As a matter of black letter law, inferring a private right of action is a matter of statutory interpretation. If Congress is silent or ambiguous, courts may not find a cause of action 'no matter how desirable that might be as a policy matter.'" *Planned Parenthood S. Atl. v. Baker*, 941 F.3d 687, 694–95 (4th Cir. 2019) (citing *Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001)). Congress creates a private right of action by utilizing language that (1) is "rights-creating" and (2) displays an intent to create a private remedy. *See Gonzaga University v. Doe*, 536 U.S. 273, 284 (2002) ("[A] plaintiff suing under an implied right of action . . . must show that the statute manifests an intent 'to create not just a private *right* but also a private *remedy*.'") (emphasis original) (quoting *Sandoval*, 532 U.S. at 286).

Two factors preclude finding that § 10307(b) creates individually enforceable private rights. First, the "[n]o person . . . shall" language of § 10307(b) is directed to the regulated party, not the party to be protected. This construction clearly prohibits voter intimidation. But it does not, under the Supreme Court's precedents, confer any new right on voters. *See Baker*, 941 F.3d at 696 ("[A] plaintiff seeking redress 'must assert the violation of a federal *right*, not merely the violation of federal *law*.'") (emphasis original) (quoting *Blessing v. Freestone*, 520 U.S. 329, 340 (1997)). Second, the statute expressly delegates enforcement authority to the Attorney General,

*see* 52 U.S.C. § 10308(d), while making no mention of a private right of action. The Supreme Court reads such alternative enforcement mechanisms to "counsel against" finding "a congressional intent to create individually enforceable private rights." *Gonzaga*, 536 U.S. at 290.

With respect to the first factor, the Supreme Court understands "[s]tatutes that focus on the person regulated rather than the individuals protected [to] create 'no implication of an intent to confer rights on a particular class of persons.'" *Sandoval*, 532 U.S. at 289 (quoting *California v. Sierra Club*, 451 U.S. 287, 294 (1981)). *See also Gonzaga*, 536 U.S. at 284 ("For a statute to create [implied] private rights, its text must be 'phrased in terms of the persons benefited."') (quoting *Cannon v. Univ. of Chi.*, 441 U.S. 677, 692, n.13. (1979)). Thus, "Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972 create individual rights because those statutes are phrased 'with an *unmistakable focus* on the benefited class."' *Id*. (quoting *Cannon*, 441 U.S. at 691, 99) (emphasis original).

> Title VI provides: "*No person* in the United States *shall* . . . be subjected to discrimination under any program or activity receiving Federal financial assistance" on the basis of race, color or national origin. 78 Stat. 252, 42 U.S.C. § 2000d (1994 ed.) (emphasis added). Title IX provides: "*No person* in the United States *shall*, on the basis of sex, . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance." 86 Stat. 373, 20 U.S.C. § 1681(a) (emphasis added).

*Id*. at n.3. But "[w]here a statute does not include this sort of explicit 'right- or duty-creating language,'" the Court "rarely impute[s] to Congress an intent to create a private right of action." *Id*. (citing *Cannon*, 441 U.S. at 690, n.13; *Sandoval*, 532 U.S. at 288).

As with the nondisclosure provisions of Family Educational Rights and Privacy Act ("FERPA") at issue in *Gonzaga*, the anti-intimidation provision of the Voting Rights Act cited by Schilling "entirely lack[s] the sort of 'rights-creating' language critical to showing the requisite congressional intent to create new rights." *Id*. at 287. Both statutes address the subject

of the prohibited conduct rather than the person to benefit from its protection. FERPA directs the Secretary of Education that "[n]o funds shall be made available" to any "educational agency or institution which has a policy or practice of permitting the release of education records . . . of students . . . ." 20 U.S.C. § 1232g(b)(1). And the Voting Rights Act directs all "person[s]" that they shall not "intimidate . . . any person for voting or attempting to vote[.]"52 U.S.C. § 10307(b).

With respect to the second factor, the inclusion of an explicit enforcement mechanism tends to negate the implication of an additional unstated mechanism. *See e.g.*, *Gonzaga*, 536 U.S. at 289 (treating "the mechanism that Congress chose to provide for enforcing" a statute's provisions as relevant context in determining whether the provision creates a private cause of action). For example, the Court's conclusion in *Gonzaga* that FERPA's nondisclosure provisions failed to confer enforceable rights was deemed "buttressed" by the fact that FERPA's text authorized the Secretary of Education to "deal with violations", 20 U.S.C. § 1232g(f), while making no mention of a private right to sue. *Id*. at 289–90.

The Fourth Circuit recently declined to find a private right to sue in the nondisclosure provision of the Health Insurance Portability and Accountability Act ("HIPPA") along the same lines. The provision at issue in that case punishes "[a] person who knowingly . . . discloses individually identifiable health information to another person". 42 U.S.C. § 1320d-6(a), (b). In holding that this language does not create a private cause of action, the Fourth Circuit relied entirely on the fact that "HIPPA does not expressly allow for a private cause of action but delegates enforcement authority to the Secretary of the Department of Health and Human Services, reflecting Congress's intent to forgo creating a private remedy." *Payne v. Taslimi*, 998 F.3d 648, 660 (4th Cir. 2021).

So too here. 52 U.S.C. § 10308(d) provides that "[w]henever any person has engaged or there is reasonable grounds to believe that any person is about to engage in any act or practice prohibited by section . . . 10307 of this title . . . the Attorney General may institute for the United States . . . an action . . . ." There is no mention whatsoever of a private right to sue.

Candor demands acknowledging that the determination of a statute's focus—whether it be on the person to be regulated or the individual to be protected—is not susceptible to formularized and perfectly predictable criterion. But the parallel construction of § 10307(b) with the nondisclosure provisions of FERPA and HIPPA, once combined with Congress' explicit delegation of enforcement authority to the Attorney General, gives the Court sufficient confidence to conclude that there is no implied private right of action here. *Cf. Gonzaga*, 536 U.S. at 290 (relying on multiple considerations in concluding that FERPA's nondisclosure provisions fails to create a private cause of action). The motion to dismiss will be granted as to Schilling's Voting Rights Act claim.[1]

**<u>Counts Three, Four, and Five</u>: Intentional Torts**

Lastly, Schilling brings state law claims for assault, battery, and false imprisonment. Amended Complaint ¶¶ 60–74. While Mallek is not alleged to have committed any of these torts

---

[1] In 1969 the Supreme Court interpreted language in § 5 of the Voting Rights Act to create a private remedy. *See Allen v. State Board of Education*, 393 U.S. 544. In contrast to the provision at issue here, that part of that Act utilized "rights-creating" language: "no person shall be denied the right to vote for failure to comply with [a new state enactment covered by, but not approved under, s 5]." *Id*. at 555 (alterations original) (quoting 52 U.S.C. § 10304). Moreover, the Supreme Court has made clear that *stare decisis* does not require the revival of defunct methods of interpretation because those methods were once used on another provision of the statute at issue. *See Sandoval*, 121 U.S. at 287 ("Not even when interpreting the same Securities Exchange Act of 1934 that was at issue in *Borak* have we applied *Borak*'s method for discerning and defining causes of action.").

directly, Schilling claims that Mallek is nevertheless liable because Mallek "acted in concert and with a common purpose" and "engaged in a civil conspiracy" with his co-defendants to commit torts against him. *Id*. at ¶ 8.

"[C]ivil conspiracy is a mechanism for spreading liability among coconspirators for damages sustained 'as a result of an [underlying] act that is itself wrongful or tortious.'" *La Bella Dona Skin Care, Inc. v. Belle Femme Enterprises, LLC*, 805 S.E.2d 399, 405 (Va. 2017) (quoting *Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 317 (Va. 2014)) (emphasis original). "A common law conspiracy consists of two or more persons combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means." *Commercial Bus. Sys., Inc. v. Bellsouth Servs., Inc.*, 453 S.E.2d 261, 267 (Va. 1995).

Mallek's acquiescence to the actions of his co-Defendants is sufficient to raise a plausible inference that he had a common design or purpose with his co-Defendants to commit the claimed torts.

> In Virginia, a false imprisonment is the direct restraint by one person of the physical liberty of another without adequate legal justification. Virginia defines a battery as an unwanted touching which is neither consented to, excused, nor justified, and an assault as an act intended to cause either harmful or offensive contact with another person or apprehension of such contact, and that creates in that person's mind a reasonable apprehension of an imminent battery. A legal justification for the act being complained of will defeat an assault or battery claim.

*Unus v. Kane*, 565 F.3d 103, 117 (4th Cir. 2009) (citations an internal quotation marks omitted). *See also Zayre of Va., Inc. v. Gowdy*, 147 S.E.2d 710, 713 (Va. 1966) ("False imprisonment is restraint on one's liberty without any sufficient cause[, therefore it] is not essential that a citizen

be confined in jail or placed in the custody of an officer."). Mallek's motion to dismiss the state law claims will be denied.

**IV**

Mallek's motion to dismiss, Dkt. 6, will be granted in part and denied in part. It will be granted with respect to Count Two and denied with respect to all other counts.

****

The Clerk of the Court is hereby directed to send this Memorandum Opinion to all counsel of record.

Entered this 18th day of March 2022.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE